IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 25, 2022 Session

## STATE OF TENNESSEE v. GEORGE STEVEN WATERS

**Appeal from the Criminal Court for Polk County**
**No. 13-CR-31      Sandra Donaghy, Judge**

_____

### No. E2021-00218-CCA-R3-CD

_____

Defendant, George Steven Waters, was convicted by a jury of one count of reckless homicide. The trial court imposed a sentence of four years, suspended to ten years of supervised probation after service of 364 days in confinement. On appeal, Defendant argues that the evidence was insufficient to support his conviction; that the trial court erred in denying his request for judicial diversion; and that his sentence is excessive. Following our review of the entire record and the briefs of the parties, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J. and TIMOTHY L. EASTER., J., joined.

G. Scott Kanavos and Paula Henderson, Cleveland, Tennessee, for the appellant, George Steven Waters.

Herbert H. Slatery III, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Stephen D. Crump, District Attorney General; and Andrew Watts and Drew Robinson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

Defendant shot and killed Wanda, Willard, and Doug Waters, who were his aunt, uncle, and cousin, during an argument concerning an ongoing family property dispute.

Defendant's defense was that Willard[1] and Doug were attempting to kill him and his father, George Waters. Wanda was present and allegedly participated in the argument, but it was not alleged that she attempted to kill Defendant or George. The Polk County grand jury returned an indictment against Defendant charging him with three counts of premeditated first-degree murder.

*Trial*

The Waters Family lived on George Road in Copperhill. George and Shirley, Defendant's parents, lived on the top of a hill at the end of the road, and Willard (George's brother) and Wanda (Shirley's sister) lived next door. Two of Willard and Wanda's children, Doug Waters and Lora Kennedy, lived in a mobile home behind Willard and Wanda's home. Defendant and his wife and daughter lived down the road from the others. The two families were embroiled in a boundary dispute that arose in 2010 concerning George and Shirley's property and Willard and Wanda's property. At various times, the families obtained retraining orders against each other, and George and Shirley eventually filed a petition to quiet title which was pending in chancery court at the time of the shootings. The chancery court ultimately resolved the boundary dispute in favor of George and Shirley.

Defendant testified concerning the ongoing property dispute and explained that the judge in chancery court had said that no one was supposed to be doing any work in the disputed property area. He said that the judge had also advised the parties to take notes and make pictures of anyone doing anything in the area. George then purchased a camera for that purpose. Defendant noted that on one occasion in chancery court, Wanda pointed her finger in Defendant's face and said, "I'll see you dead." He said that the chancery court judge heard her comment. Defendant testified that due to the constant tension between the families, he and George each acquired a handgun carry permit and handguns for personal protection.

On the afternoon of August 17, 2012, Doug was grading the road with a tractor on the disputed property. Lora Kennedy testified that the highway department had stopped grading the road, and part of it had washed away at the time Doug was grading it. At approximately 2:10 p.m., Doug called 911 and reported that Defendant and George were "trying to stop us from grading our road." Doug said that Defendant and George had guns and were using their trucks to "block the tractor." He also reported that Defendant and George were "trying to fight with us," and one of them "even acted like he was [going to] pull his gun out."

---

[1] Because a number of the individuals involved in this case share the same last name, we will refer to those parties by their first names. We mean no disrespect.

Defendant called 911 a few minutes later and said that he had shot Willard, Wanda, and Doug. He reported that there had been a property dispute with the neighbors who had driven their tractor over and "started their shit." Defendant said: "They took my daddy's gun away from him, and they hit him and knocked him down. And they turned and [were going to] kill him." Defendant told the 911 operator that he "had to shoot" and "had to stop all three of them." Defendant then gave the phone to Shirley, and she said that George had traveled down the road to take pictures of Willard, Wanda, and Doug who were in the "disputed area." Shirley reported that Willard and Doug began "beating the tar" out of George and "took his gun away from him." At that time, she did not know who had been shot. Shirley asked Defendant if Wanda had been shot, and she then told the dispatcher that "Wanda tried to take [Defendant's] gun away from him."

Emergency personnel arrived on the scene, and Wanda and Doug were pronounced dead. Doug was lying in the road and had gunshot wounds to the back of his head and lower back. Wanda was lying in the grass approximately ten feet away and had a gunshot wound to the top of her head. Willard was still alive and lying in the road near Doug. He had also been shot in the back of the head and was transported to the hospital where he later died. Defendant was still at the scene tending to George who had a wound to his head and abrasions on his knee. Shirley was also there. George was transported to the hospital, treated, and later released. At the scene, George's truck was parked perpendicular to Doug's tractor near the intersection of George Road and Doug's gravel driveway

Deputy Frank Bean of the Polk County Sheriff's Office responded to the shooting and retrieved George's gun that was lying between Willard and Doug, and Defendant surrendered his weapon. Both weapons were nine-millimeter semi-automatic handguns. George's gun was blood-stained; it was later determined that Doug's DNA was on George's gun. It had been fired once and was jammed. Defendant's gun had been fired five times. Three of the bullets fired from Defendant's gun were recovered from Wanda's and Doug's bodies during the autopsy, and the two other bullets were never found. A gunshot residue test indicated that Doug was shot from a maximum distance of five feet. The bullet that struck Willard in the back of the head exited his forehead and was never found.

Deputy Bean testified that Defendant said Doug attacked George before the shootings and took George's gun from him. Defendant said that Doug then hit George on the top of the head with the gun. Deputy Bean noted that Defendant was calm after the shootings. Defendant told him that Wanda stood up as he fired at Doug. Deputy Bean transported Defendant to the Polk County Jail where he was booked in by Deputy Scott Davis. Deputy Davis testified that Defendant told him that Willard, Wanda, and Doug were beating George and that he had to protect George.

Shirley Waters testified that on August 17, 2012, she was in the bathroom cleaning up from having prepared supper when she heard rapid gunfire. She walked outside onto

- 3 -

the porch and saw Defendant's truck. Shirley ran to the bottom of the hill and saw Defendant who told her to get some wet towels for George, whom she thought was dead. She testified that Defendant wrapped the towels around George's head and face and held pressure to George's head. Shirley said that George's shirt was open, and his holster was showing. She testified that Defendant was on the phone with the 911 operator and then handed the phone to her. Shirley told the operator that Wanda attempted to take Defendant's gun, but testified that she did not know how she obtained that information because she was not present when Wanda or any of the others were shot. She also told the 911 operator that Willard and Doug were "beating the tar" out of George. However, she admitted that no one told her George was beaten by Willard and Doug. Shirley testified that she was "scared out of [her] mind" at the time. She admitted that she did not see anything that happened at the time of the shootings. Shirley testified that George left the house in his truck before the shootings to take pictures of Willard and Doug who were in the disputed property area. She also testified that both George and Defendant had purchased firearms and obtained gun carry permits due to increasing tension between the parties over the property dispute.

Defendant testified that he was working for the Polk County Road Department on the day of the shootings and that he and his co-workers were dismissed early from work that day due to the heat. Defendant left work between 1:30 and 2:00 p.m. and drove home. He spoke with George on the way home, and they discussed their plans for the remainder of the day. Defendant testified that there was no discussion at the time about George taking pictures of anything. When Defendant arrived home, he was checking his mail at the mailbox and saw a tractor. He could not tell who was operating the tractor. He thought at that point there was going to be trouble.

Defendant testified that as he drove toward George and Shirley's house, he could see George's truck, and the tractor was pulled against the side of the truck. He noted that the driveway to George's house was blocked, but the road was not blocked. Defendant testified that Doug was standing in front of George and had each of his arms pinned against the side of the truck. Defendant drove around George's truck and parked. Doug pointed at him as he drove around. Defendant testified that he got out of his truck and heard Doug screaming and cursing at George, and Doug said that he was going to "stomp" George's and Defendant's "brains out." Defendant said that Doug also threatened to kill him and George. Defendant testified that Willard and Wanda were standing in close proximity to Doug. He said that at some point George attempted to walk back toward Defendant, and George told Doug that he was only taking pictures of them in the disputed area. Defendant testified that George told Doug to call the "law" to verify that he was supposed to be taking pictures, and Doug said that he had already called them. Defendant said that George attempted to walk back to his house to wait for police but Doug said that he was tired of having his picture taken, and he "jerked" the camera out of George's hand.

- 4 -

Defendant testified that Doug then punched George in the face, knocking him to the ground. He said that Doug stood over George and grabbed him by the neck. Willard then grabbed George's left arm and told Doug to get George's gun, and Willard shouted, "shoot the son of a bitch." Defendant testified that Willard, Wanda, and Doug were all "screaming, hollering, and cussing." He said that Doug had George's gun in his hand and hit George on the head with it. Doug then placed the gun against George's head. Defendant drew his weapon and yelled at Doug to drop the gun. Defendant said that Wanda, who was on his left side, grabbed his shirt as he drew his weapon and was hitting him while trying to pull him back. He either shoved or elbowed her to get her "off of him." Defendant testified that Doug then pointed George's weapon at him, and Defendant shot him because he was afraid that Doug was going to kill him or George.

Defendant said that he and Willard both attempted to get the gun after Doug fell, and Willard hit Defendant on top of the head. Defendant yelled at Willard to leave the gun on the ground, and shot Willard as he reached for the gun. Defendant did not know where Wanda was at the time, and he did not know how she got shot. He noted that George was lying on the ground unconscious between Willard and Doug. Defendant said that he noticed Wanda's body on the ground as he dragged George's body away from the others. He testified that George had a cut on the right side of his head and blood on his face. At that time he realized that George had not been shot as he previously thought. Defendant noted that George's shirt had been ripped open, and his gun holster was unfastened but still around his body. He called 911 and handed the phone to Shirley at some point. When Deputy Bean arrived on the scene, Defendant told him where the guns were located. Defendant denied telling anyone that Wanda stepped out in front of him and that he shot her by accident. He also thought that he said, "I don't know" when Shirley asked him during the 911 call if Wanda had been shot.

Dr. Steven Cogswell, a forensic pathologist and Deputy Chief Medical Examiner for Hamilton County, testified for the defense. He examined the forensic evidence in this case and opined that that bullet which struck Wanda was most likely the same bullet that struck Willard. Dr. Cogswell testified that Wanda's death would not have been instant but would have occurred within a matter of five to ten seconds which would explain the short distance between Willard and Wanda's bodies. Additionally, Dr. Cogswell opined that due to the downward flow of blood from the bullet wound, Wanda would have been upright at some point after she was struck by the bullet. He further testified that brain matter found on Wanda likely belonged to Willard suggesting very close proximity, and that one bullet caused both deaths.

Dr. Thomas Deering, who performed the autopsies on Willard, Wanda, and Doug, testified on rebuttal. He opined that while it was possible that the bullet from Willard passed through to Wanda, it was not likely or probable.

Based on this evidence, the jury acquitted Defendant of first-degree murder in the deaths of Willard and Doug. The jury convicted Defendant of the lesser-included offense of reckless homicide in the death of Wanda.

*Sentencing Hearing*

The presentence report was introduced as an exhibit at the sentencing hearing. Victim impact testimony was given by family members, and several victim impact statements were read into the record.

Sherry Gaston, an employee with the Tennessee Department of Probation and Parole, testified that she prepared the presentence report and administered a Strong 'R' Assessment on Defendant which is a "risk needs assessment." She explained that the assessment measures Defendant's possibility of reoffending, and the same questions are asked of every person who is assessed. Ms. Gaston testified that based on his score, Defendant was at a low risk to reoffend. She said that Defendant had no prior criminal history, including no traffic violations. Ms. Gaston testified that Defendant graduated from high school and had a history of maintaining continuous gainful employment. She noted that the only time that Defendant had a lapse in employment was during his incarceration for the present offense. Ms. Gaston testified that Defendant had a supportive family and housing, and he had no mental health issues. She also said that he had a low risk of aggression. Ms. Gaston testified that Defendant wore an ankle monitor after his release from jail, and he had no reported bond violations. He also had no disciplinary actions during his incarceration, as verified by Polk County Jail Administrator Teresa Hammons.

Reverend Jim Mabe testified that he was involved in an anger management program at the Polk County Jail for approximately seven years, and he met Defendant through the program while Defendant was incarcerated. He described Defendant as "outstanding" and said that Defendant never missed a meeting while in the program. It was Reverend Mabe's opinion that Defendant was a truthful, kind, and loving individual. He said that Defendant worked for him for three months after Defendant was released from jail. Reverend Mabe testified that Defendant was a reliable worker who never missed a day of work. He said that he had invited Defendant into his home, and he loved and respected Defendant like his own son. Reverend Mabe noted that Defendant had a pacemaker, but his health issues did not affect his job performance.

Josh Bosdell and Gary Pike, two of Defendant's coworkers at Crystal Geyser, testified that Defendant was an honest, law abiding, hardworking, and peaceful person. Mr. Bosdell said that Defendant helped him out when Mr. Bosdell's wife was sick with cancer. Jason Waters, Defendant's cousin and Willard and Wanda's son, testified that he lived beside Defendant growing up, and he had never known Defendant to get into a fight. Jason also said that Defendant was an ordained minister and always had a job. He also believed Defendant to be an honest person.

Defendant testified that he was an ordained Baptist preacher, and he had also been ordained as a deacon. He said that he lived beside his aunt, uncle, and cousins growing up, and he got along with them. Defendant testified that he began working as a mechanic at the age of sixteen, and he graduated from the Polk County High School in 1998. He recited his work experience until he went to work for the Polk County Road Department in 2004. He remained there until his arrest in this case. Defendant testified that he had never been without a job since the age of sixteen, and he had never been fired from a job until his arrest. He said that he immediately found a job after he was released on bond from jail.

Defendant testified that he left Copper Hill after the offense, and he never returned. He requested to wear an ankle monitor after he was released from jail so that no one else had to keep up with him. Defendant testified that the only times he left the 10th Judicial District in nearly five years was to attend medical appointments. Defendant testified that the ankle monitor was removed one time when he had surgery to have his pacemaker replaced. He said that he always notified the monitoring company when he went to a medical appointment or when he and his daughter were going fishing.

Defendant testified that he was acting in defense of his father at the time of the shootings, and he did not know how Wanda got shot. He remembered shoving her off of him before the shooting. Defendant testified that Wanda participated in the argument with George, and she was the "instigator." He said that Wanda made it difficult to reason with Willard and Doug. Defendant testified that there was brain matter on the top of Wanda's head that was washed off during the autopsy which was never tested to see if it was Willard's. He noted that he and George both had a handgun carry permit, and Defendant always carried his weapon. Defendant testified that he had never pulled his gun on anyone else.

Defendant testified that he sees a doctor every three to six months for his heart condition, and he is currently seeing an orthopedic doctor because he dislocated his shoulder at work. Defendant testified that he no longer works at Crystal Geyser due to his injury and that he reports to the staffing agency every day and helps with paperwork until he is cleared to go back to Crystal Geyser.

On cross-examination, Defendant testified that the shooting was Wanda's fault and that she instigated everything. He also blamed Wanda for not trying to pull Willard and Doug back. Defendant noted that the chancery court judge had ordered that pictures be taken of anyone working on the disputed property. When asked if he placed any blame on himself, Defendant testified:

> What more could I have done? I come in on a heated argument. I come in on a situation, that there was a gun introduced - - and they had my father down. They was killing him. And upon fear of his

life, and upon fear of mine, I done the only thing I possibly could do, and that's stop the threat.

Defendant further testified:

They might not have found me guilty if that brain mat[t]er had been saved, right along with the other nail scrapings showing the blood -- everything else that was excluded from this trial from being introduced. You not only robbed the family that's 'a [sic] grieving that wrote you letters, you not only robbed them of the opportunity to know exactly how it happened, or what happened, but you robbed me of the part of the proof of my innocence. Therefore you got a conviction of a reckless homicide, because of a main important part that [the prosecutor] argued standing right here. There were no way the bullet went through Willard's head, then struck Wanda in the top of the head, but that brain mat[t]er that could have proved that without a reasonable doubt. If you noticed in your pictures of your crime scene, it was there. But once she was in the body bag according to Mr. Thomas Deering, it was not sent with it. It was never saved. You robbed me of that.

Defendant said that a verbal altercation escalated to a physical altercation, and he felt that Wanda's shooting was an accident. He testified that he drew his weapon because his and his father's lives were threatened.

Scott Cranmore testified that he provided the GPS ankle monitor that Defendant wore after he was released from jail. He said that Defendant paid $210 per month for the monitoring service. Mr. Cranmore testified that Defendant was responsible for charging the device and reporting any problems with it. He said that Defendant reported any time that he left the confines of the 10th Judicial District and that Defendant only left to attend medical appointments in Chattanooga. Mr. Cranmore noted that the ankle monitor was removed one time when Defendant had surgery. He said that Defendant followed the monitoring program "110 percent" and would call anytime that he went fishing.

Mr. Cranmore testified that Defendant was always respectful and held himself accountable. He believed Defendant would be a good citizen and that he is an honest person. Mr. Cranmore further believed that Defendant was sorry for what happened. He felt that Defendant was a peaceful person, and he had never seen Defendant behave aggressively. On cross-examination, Mr. Cranmore agreed that he heard Defendant blame other people for what happened. On redirect examination, he said that he had also heard Defendant take responsibility for having been involved in the shooting and that Defendant was in a difficult situation.

In considering Defendant's request for judicial diversion, the trial court reviewed the facts of the case and the evidence presented at the sentencing hearing, noting that Jason Water's testimony had very little value because the court questioned his credibility. The trial court further recited the law concerning judicial diversion and found Defendant to be statutorily eligible for diversion. The trial court further found that Defendant's amenability to correction, his criminal record, social history, including his employment history, and his mental health weighed in favor of a grant of diversion. The trial court addressed Defendant's physical health which she noted as "fair" due to a heart condition, and said, "I don't know that it speaks to either for or against a grant [or] denial of diversion." In considering Defendant's social history, the trial court said: "I saw little remorse, and I heard no apology from the Defendant. I did hear him say that he loves all of the people in the room." The trial court felt that Defendant "doesn't take responsibility for what happened, and so that causes me to have some concern for his - - the emotional status."

In ultimately denying Defendant's request for diversion, the trial court found:

> Okay. I skipped over the circumstances of the offense. The incidents of August 17[], 2012, have resulted in the loss of the lives of three persons, but he was acquitted by a Jury of the two cases. Nonetheless, the circumstances of this offense are aggravated in that there is loss of life over basically, a feud. A feud over land in dispute, and who had the right to grade the road at the time. So that weighs against diversion.
>
> And then, deterrence to both the accused and others. The law in a sentencing hearing, so once diversion had been - - or if diversion is denied the law requires that I look at statistics. And among the statistics I reviewed were reports from the Administrative Office of the Courts.
>
> I looked at the sentencing statistics, which I'll come back to, but I looked at the annual report of the Tennessee Judiciary for [fiscal] years 2015, [20]16, 2014 and [20]15, and 2013, [20]14.
>
> There are no statistics as to reckless homicide, but if you look at the filings, filings, in this judicial district for homicide cases and assaultive cases, in 2013, [20]14 there were eleven.
>
> In [20]14, [20]15, the sum of the filings, there was one homicide and fourteen [sic] assaultive cases were fifteen. And in 2015, [20]16 the sum of those two categories were nineteen.

And so looking at those statistics, it appears that violent or assaultive crimes are on the increase in Polk County, cuz' [sic] those are the only ones that I looked at, and they have gone from eleven to fifteen to nineteen. Those statistics support evidence that there is a need to deter not only this accused, but others from this sort of behavior, so that weighs against a grant of diversion.

And then the last one is, whether [j]udicial [d]iversion will serve the ends of justice for both the public and the accused.

In my mind this seems like a senseless crime. And all crimes - - all crimes, I ask myself, why? How did we get there? And sometimes it's drugs that impaired somebody's judgment. Or alcohol that impaired their judgment. In this case, it seems as though there was a long[-]standing problem, and the parties went to the court, and the courts deferred them, or brushed them off; and issued orders of protection, suggest that they take photographs, had them do surveys, but the problem just kept festering.

And for the safety of the public, and in the interest of justice, this is one of those cases where [j]udicial [d]iversion just does not serve the ends of justice, so for those reasons I deny the request by the [d]efense for [j]udicial [d]iversion.

In determining the appropriate sentence for Defendant to serve, the trial court again considered the evidence presented at trial and at the sentencing hearing, including the presentence report; the principles of sentencing and arguments as to sentencing alternatives; the nature and characteristics of the criminal conduct involved; evidence regarding the mitigating and enhancement factors; statistical information provided by the Administrative Office of the Courts; Defendant's allocution; and the results of Defendant's risk and needs assessment.

The trial court noted that Defendant was a Range I offender convicted of a Class D felony, which carried a sentencing range of two to four years. The court applied two enhancement factors: Defendant treated, or allowed the victim to be treated, with exceptional cruelty during the commission of the offense; and Defendant possessed or employed a firearm during the commission of the offense. *See* T.C.A. § 40-35-114 (5) and (9). In determining that enhancement factor (5) applied in Defendant's case, the trial court said:

In this case, the Defendant called for his mother to bring wet towels and he cared for his father's abrasions, yet he rendered no aid to Marion Doug Waters, Willard Waters, or Wanda Waters, inspite

- 10 -

[sic] of the fact that when the rescue squad arrived, at least eleven minutes later, Willard Waters was still breathing. And so I think failure to render aid to other harming - - to other persons that were suffering shows exceptional cruelty under the circumstances.

The trial court did not find that any mitigating factors applied and said, "Once again, I think the [j]ury mitigated this case by acquitting on Counts 1 and 3."

In considering the manner of service of Defendant's sentence, the trial court considered all of the appropriate factors and reiterated its findings relative to the denial of judicial diversion. The trial court noted that Defendant's risk of committing another crime was low and that "[i]t is likely he would not commit further crimes if he were placed on probation." In considering whether to grant Defendant full probation, the trial court found:

Whether or not a sentence of full probation would unduly depreciate the seriousness of the offense. I believe that a sentence of full probation would unduly depreciate the seriousness of the offense. This crime involves the loss of life, and although, as I started this, there is nothing that I can do that would replace the life, and no sentence that I could impose, that will value the life when life is taken, a sentence of full probation is inappropriate.

And whether or not confinement is particularly suited to provide an effective deterrent to others likely to commit [a] similar offense. In my discussion of diversionary treatment, I talked about the statistical information available, and so I rely on this in this finding as well.

And whether or not the offense was particularly enormous, gross or heinous. That's one of those, every murder is enormous, gross, and heinous; therefore, it carries no particular weight in this Defendant's case.

The trial court concluded that a sentence of split confinement was appropriate in Defendant's case. The court sentenced Defendant to four years, suspended to ten years of supervised probation after service of 364 days in confinement.

## ANALYSIS

### I.  Sufficiency of the Evidence

Defendant contends that the evidence was insufficient to support his conviction for reckless homicide because "there was no gross deviation from the standard of care of a

person engaging in self-defense," and "the unfortunate killing of Wanda Waters was justified under the doctrine of self-defense and defense of another." The State responds that the evidence presented was sufficient to sustain Defendant's conviction.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009) (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see* Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citing *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005); *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *Hanson*, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *Wagner*, 382 S.W.3d at 297 (citing *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)).

A self-defense instruction was given in this case. In Tennessee, a person who is not engaged in unlawful activity may use deadly force in self-defense when that person has a reasonable belief, based upon reasonable grounds, that there is an imminent, real danger of death or serious bodily injury. T.C.A. § 39-11-611(b)(2). It is well established, under Tennessee law, "that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)).

Tennessee Code Annotated section 39-11-612 permits a person to also use deadly force "to protect a third person" when the person using deadly force "reasonably believes" that the third person would be justified in using deadly force under the self-defense statute and that "the intervention is immediately necessary to protect the third person." "The application of the right to defend another should be 'determined in the same fashion as the right of self-defense' under [section] 39-11-611." *State v. Hawkins*, 406 S.W.3d 121, 128 (Tenn. 2013) (quoting T.C.A. § 39-11-612 Sentencing Comm'n Cmts). "A person's right to defense of a third party is no greater than the third party's right to defend himself or herself." *Id.* (citing *State v. Barnes*, 675 S.W.2d 195, 196 (Tenn. Crim. App. 1984)).

Reckless homicide is defined as the "reckless killing of another." T. C. A. § 39-13-215(a).

> "Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

T.C.A. § 39-11-106(a)(31). Tennessee Code Annotated section 39-11-301(a)(2) provides:

> When the law provides that criminal negligence suffices to establish an element of an offense, that element is also established if a person acts intentionally, knowingly or recklessly. When recklessness suffices to establish an element, that element is also established if a person acts intentionally or knowingly. When acting knowingly suffices to establish an element, that element is also established if a person acts intentionally.

In this case, viewing the evidence in a light most favorable to the State, a reasonable juror could have concluded that the evidence was sufficient to support Defendant's conviction for reckless homicide. The proof shows that while Wanda was involved in the argument, there was no evidence that she attempted to kill George or Defendant or that Defendant feared that she would kill him or George. Although Defendant testified that Wanda grabbed his shirt and was hitting him and trying to pull him back before he shot at Doug, Defendant testified that he pushed her away from him, thereby eliminating her as a threat. Defendant told the officers during his interview, and he testified at trial, that he did not know how Wanda got shot. Therefore, a reasonable juror could have concluded that Defendant acted with reckless disregard when he shot and killed Wanda.

Defendant argues that the evidence was insufficient to convict him of reckless homicide because he shot Wanda in self-defense and in defense of George. He asserts that Wanda injected herself into the confrontation and helped escalate it, she remained in close proximity to Willard and Doug during the confrontation, and she failed to prevent Doug from "committing violence with a gun." Defendant further asserts that Wanda "actively tried to prevent [him] from protecting himself and his father." However, the jury heard the evidence and rejected Defendant's claim of self-defense and defense of another as to Wanda's death, as was its prerogative. We conclude that the evidence was sufficient beyond a reasonable doubt to support Defendant's conviction for reckless homicide.

Defendant asserts that an acquittal as to Wanda's death would "square [ ] with the jury's verdict on Doug and Willard Waters," and "[t]he same logic should apply to the actions against all three persons." However, "inconsistent jury verdicts are not a basis for relief." *State v. Davis*, 466 S.W.3d 49, 77 (Tenn. 2015); *Wiggins v. State*, 498 S.W.2d 92. 93-94 (Tenn. 1973). The supreme court in *Davis* recognized the "sanctity of the jury's deliberations and the strong policy against probing into its logic or reasoning, which would open the door to interminable speculation." *Davis,* 466 S.W.3d at 77 (quotations omitted). Defendant is not entitled to relief on this issue.

## II.    Sentencing

Defendant contends that the trial court erred in denying his request for judicial diversion and that his sentence is excessive. The State responds that the trial court "properly exercised its discretion" in imposing the sentence.

Our standard of review of the trial court's sentencing determinations is whether the trial court abused its discretion, and we apply a "presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. T.C.A. § 40-35-401 (2017), Sentencing Comm'n Cmts. In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant made in the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* T.C.A. § 40-35-210; *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App.

2001).  The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed.  T.C.A. § 40-35-103.

## *A.  Judicial Diversion*

Following a determination of guilt by plea or by trial, a trial court may, in its discretion, defer further proceedings and place a qualified defendant on probation without entering a judgment of guilt.  T.C.A. § 40-35-313(a)(1)(A); *State v. Dycus*, 456 S.W.3d 918, 925 (Tenn. 2015).  If the defendant successfully completes the period of probation, the trial court is required to dismiss the proceedings against him, and the defendant may have the records of the proceedings expunged.  Id. § 40-35-313(a)(2), (b); *Dycus*, 456 S.W.3d at 925.

As an offender convicted of a Class D felony and with no prior criminal record, Defendant met the statutory requirements to be considered for judicial diversion.  *See* T.C.A. § 40-35-313(a)(1)(B).  Mere eligibility, however, does not entitle a defendant to judicial diversion.  *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996).  Instead, the decision to grant or deny a qualified defendant judicial diversion "is entrusted to the trial court."  *State v. King*, 432 S.W.3d 316, 323 (Tenn. 2014) (citation omitted).  In determining whether to grant diversion, the trial court is to consider the following factors: (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, (f) the deterrence value to the accused as well as others, and (g) whether judicial diversion will serve the interests of the public as well as the accused.  *State v. Electroplating,* 990 S.W.2d 211, 229 (Tenn. Crim. App 1998).

"A trial court's decision to grant or deny judicial diversion is reviewed for an abuse of discretion with a presumption of reasonableness."  *King*, 432 S.W.3d at 327.  In *King*, our supreme court held that "nothing in *Bise* or its progeny requires the abrogation of the *Parker* and *Electroplating* factors:

> Under the *Bise* standard of review, when the trial court considers the *Parker* and *Electroplating* factors, specifically identifies the relevant factors, and places on the record its reasons for granting or denying judicial diversion, the appellate court must apply a presumption of reasonableness and uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision.  Although the trial court is not required to recite all of the *Parker* and *Electroplating* factors when justifying its decision on the record in order to obtain the presumption of reasonableness, the record should reflect that the trial court considered the *Parker* and *Electroplating* factors in rendering its decision and that it identified the specific

- 15 -

factors applicable to the case before it. Thereafter, the trial court may proceed to solely address the relevant factors.

*Id.*, 432 S.W.3d at 327 (footnote omitted).

The record reveals that the trial court carefully considered and weighed each of the *Electroplating* factors in its decision to deny Defendant's request for judicial diversion. The court found that Defendant's amenability to correction, his criminal record, social history, including his employment history, and his mental health weighed in favor of a grant of diversion. However, the trial court was concerned that Defendant showed little remorse and made no apology for his actions. The trial court further felt that Defendant "doesn't take responsibility for what happened, so that causes me to have some concern for his . . . emotional status."

The trial court found that the circumstances of the offense were aggravated and that there was "loss of life over basically, a feud," and found that the circumstances of the offense, the need for deterrence, and the interests of the public all weighed against a grant of judicial diversion. In considering deterrence, the trial court reviewed statistics from the Administrative Office of the Courts and noted that it appeared that violent or assaultive crimes were on the rise in Polk County. The trial court specifically stated that "[t]hose statistics support evidence that there is a need to deter not only this accused, but others from this sort of behavior[.]" Finally, in considering the interest of the public, the trial court noted that this seemed to be a senseless crime and that "for the safety of the public, and in the interest of justice, this is one of those cases where [j]udicial [d]iversion just does not serve the ends of justice[.]"

We find no abuse of discretion in the trial court's denial of Defendant's request for judicial diversion. As pointed out by the State, this court should not disturb the trial court's decision because there is more than "a scintilla" of evidence to support the denial of diversion. Accordingly, we affirm the judgment of the trial court.

## B. Length of Sentence

Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. *See* T.C.A. § 40-35-114; *see also Bise*, 380 S.W.3d at 701. Moreover, a trial court is "guided by - but not bound by - any applicable enhancement factors when adjusting the

length of a sentence[,]" and its "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706.

In this case, Defendant faced a sentencing range of two to four years as a Range I, standard offender for his conviction of reckless homicide, a Class D felony. The trial court imposed the maximum sentence of four years. The record reflects that the trial court considered the enhancement and mitigating factors and applied two enhancement factors: Defendant treated, or allowed the victim to be treated, with exceptional cruelty during the commission of the offense; and Defendant possessed or employed a firearm during the commission of the offense. *See* T.C.A. § 40-35-114 (5) and (9). The trial court did not find any applicable mitigating factors. Defendant challenges the court's findings as to enhancement factor (5) and the lack of mitigating factors.

Having reviewed the record before us, we conclude that the trial court clearly stated on the record its reasons for the sentence imposed, and Defendant's sentence is within the appropriate range and "justly deserved in relation to the seriousness of the offense." T.C.A. §40-35-102(1). The record reflects that the trial court considered the purposes and principles of the Sentencing Act. Although we agree with Defendant that enhancement factor (5) is not applicable in this case, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence unless the trial court wholly departed from the [Sentencing Act]." *Bise*, 380 S.W.3d at 706; *see also State v. Gray*, 960 S.W.2d 598, 611 (Tenn. Crim. App. 1997) ("Enhancement factor (5) is usually found in cases of abuse or torture"). We note that enhancement factor (9) was appropriately applied. There is no dispute that Defendant employed a firearm. *State v. Bobby Joe Russell*, No. 03C01-9608-CR-00319, 1997 WL 573475, at *6 (Tenn. Crim. App. Sept. 16, 1997) (Because employing a firearm is not an element of reckless homicide, enhancement factor (9) was properly considered to enhance sentence). Therefore, the trial court's imposition of the maximum sentence of four years for reckless homicide is presumed reasonable.

*C. Full Probation*

As for the denial of full probation, "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to . . . questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). A defendant "who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.]" T.C.A. § 40-35-102(6). In determining whether to grant or deny probation, a trial court should consider the circumstances of the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978). "[T]he burden of establishing suitability for probation rests with the defendant." T.C.A. § 40-35-303(b). "This burden

includes demonstrating that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008) (quoting *State v. Housewright*, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)). A trial judge must consider the following factors before imposing a sentence of incarceration:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(1). Additionally, the sentence imposed should be the least severe measure necessary to achieve its purpose, and the defendant's potential for rehabilitation, or lack thereof, should be considered when determining whether to grant alternative sentencing. *Id*. § 40-35-103(4) and (5). Trial judges are encouraged to use alternative sentencing when appropriate. *Id*. § 40-35-103(6). In this case, Defendant received the sentencing alternative of split confinement. *See id.* § 40-35-306(a). Split confinement involves an initial period of confinement followed by probation:

> A defendant receiving probation may be required to serve a portion of the sentence in continuous confinement for up to one (1) year in the local jail or workhouse, with probation for a period of time up to and including the statutory maximum time for the class of the conviction offense.

*Id.*

The trial court's findings of fact in this case support its conclusion that Defendant was not a suitable candidate for full probation and the order for Defendant to serve 364 days in confinement followed by ten years of supervised probation. The trial court reiterated its findings relative to the denial of judicial diversion and found that some period of incarceration was necessary to avoid depreciating the seriousness of the offense and to deter others from committing a similar offense. T.C.A. § 40-35-103(1)(B); *State v. Sihapanya*, 516 S.W.3d 473, 476 (Tenn. 2014) (deferring to the trial court's decision to deny probation where the court "combined the need to avoid depreciating the seriousness of the offense with the need for deterrence and the nature and circumstances of the offense"). We also note that in considering judicial diversion, the trial court was concerned that Defendant showed no remorse for his actions. A lack of remorse can be utilized by a trial court during the consideration of probation. *State v. Dowdy*, 894 S.W.2d 301, 306 (Tenn. Crim. App. 1994); *State v. Celeste Hall*, No. M2005-00715-CCA-R3-CD, 2005 WL

3543416, at *5 (Tenn. Crim. App. Dec. 27, 2005); and *State v. Brian Goodrich*, No. M2002-03017-CCA-R3-CD, 2004 WL 367719, at *3 (Tenn. Crim. App. Feb. 27, 2004).

We also find that the trial court acted within its discretion by placing Defendant on probation for a period of ten years following the suspension of his four-year sentence after service of 364 days. As pointed out by the State, the Sentencing Act gives a trial court the authority to impose a period of probation "up to and including the statutory maximum time for the class of the conviction offense." T.C.A. § 40-35-306(a). The offense of reckless homicide has a maximum statutory punishment of twelve years. Id. § 39-35-112(c). The trial court determined that the probationary period of ten years was appropriate given the serious nature of the offense. The court noted that had Defendant been ordered to serve his entire four-year sentence in confinement, he would be eligible for parole soon after the sentence was imposed. However, a period of split confinement would allow the trial court to impose a longer probationary period, which would avoid depreciating the seriousness of the offense and ensure public safety.

The trial court did not abuse its discretion in denying full probation and ordering split confinement in this case given Defendant's lack of remorse, combined with the need to avoid depreciating the seriousness of the offense and to deter others from committing a similar offense. Defendant is not entitled to relief on this issue.

## CONCLUSION

Based on foregoing analysis, we affirm the judgment of the trial court.

_____
JILL BARTEE AYERS, JUDGE